# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNILOC USA, INC., UNILOC LUXEMBOURG, S.A., | : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil Action No. 17-1658-CFC |
| MOTOROLA MOBILITY, LLC, | : : : | |
| Defendant. | : : | |

---

Sean O'Kelly, O'KELLY ERNST & JOYCE, LLC, Wilmington, Delaware; Aaron Jacobs, James Foster, Kevin Gannon, PRINCE LOBEL TYE LLP, Boston, Massachusetts

*Counsel for Plaintiffs*

Jeremy Tigon, Karen Jacobs, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Anthony Tomaselli, Carly Conway, Kristin Noel, Martha Snyder, QUARLES & BRADY LLP, Madison, Wisconsin

*Counsel for Defendant*

## MEMORANDUM OPINION

December 30, 2020
Wilmington, Delaware

COLM F. CONNOLLY,
UNITED STATES DISTRICT JUDGE

Plaintiffs Uniloc Luxembourg, S.A. and Uniloc USA, Inc. have sued

Defendant Motorola Mobility LLC for infringement of U.S. Patent No. 6,161,134

(the #134 patent). D.I. 10. Motorola has moved pursuant to Federal Rule of Civil

Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction on the grounds

that the Unilocs do not have standing to sue for infringement of the asserted patent.

D.I. 56. I will grant the motion.

## I.    BACKGROUND

The Uniloc Plaintiffs are in the business of acquiring patents and suing

companies for infringement of those patents. Beginning in December 2014, to

fund their litigation efforts, the Unilocs made certain financial arrangements with

nonparty Fortress Credit Co. LLC. In a nutshell, Fortress agreed to loan the

Unilocs up to $26 million and purchased stock options in Uniloc Luxembourg; in

return, the Unilocs granted Fortress a share of their revenues. As security for the

$26 million loan, the Unilocs granted Fortress a license in a patent portfolio.

The relevant terms of the financial arrangements between Fortress and the

Unilocs were set forth in two written agreements originally executed in December

2014 and amended thereafter. The first is titled Conformed Revenue Sharing and

Note and Warrant Purchase Agreement and is referred to by the parties as the

Purchase Agreement. The second is titled Patent License Agreement.

Under the express terms of both agreements, Fortress obtained a license to

the Uniloc patent portfolio on December 30, 2014, but it agreed not to "use" the

license unless and until a so-called "Event of Default" occurred. D.I. 58-1, Ex. A §

2.8; D.I. 58-1, Ex. B § 2.1. The Purchase Agreement describes the license as "a

non-exclusive, royalty free, license (including the right to grant sublicenses). . .

which shall be evidenced by, and reflected in, the Patent License Agreement." D.I.

58-1, Ex. A § 2.8. The Patent License Agreement grants to Fortress the right to

sublicense the patents (after an Event of Default) at its "sole and absolute

discretion solely for the benefit of [Fortress]." D.I. 58-1, Ex. B § 2.1.

Under section 7.1.2 of the Purchase Agreement, the "fail[ure of the Unilocs]

to perform or observe any of the covenants or agreements contained in Article VI"

constitutes an Event of Default. D.I. 58-1, Ex. A § 7.1.2. One of those covenants,

set forth in section 6.2.2 of the Purchase Agreement, required that, "[a]s of March

31, 2017 and the last day of each fiscal quarter thereafter, the [Unilocs] . . . have

received at least $20,000,000 in Actual Monetization Revenues during the four

fiscal quarter period ending on such date." D.I. 58-1, Ex. A § 6.2.2. Motorola has

asserted, and the Unilocs have not contested, that the Unilocs received only $14

million in revenues as of March 31, 2017 and thus failed to satisfy section 6.2.2's

monetization requirement.

Under section 5.2 of the Patent License Agreement, Fortress's license to the

patent portfolio

> shall end after the later of (x) the expiration of the last
> Licensed Patent to expire, (y) the date on which all statutes
> of limitations have fully run for bringing infringement
> claims under the Licensed Patents and (z) the termination
> of any sublicensing agreement by [Fortress] with regards
> to the Licensed Patents.

D.I. 58-1, Ex. B § 5.2.

On May 16, 2017, Uniloc Luxembourg acquired by assignment from

Hewlett Packard Enterprise Company several patents, including the #134 patent.

The assignment included "the right to sue for injunctive relief and damages . . . for

infringement of any of the [a]ssigned [p]atents accruing at any time prior to, on, or

after the" effective date of the assignment. D.I. 58-2, Ex. K § 2.1. Motorola has

asserted, and the Unilocs have never contested, that the #134 patent became part of

the Uniloc patent portfolio in which Fortress held a security interest the same day

that Uniloc Luxembourg acquired the patent from Hewlett Packard. *See* D.I. 67 at

4, 7; D.I. 86 at 2; D.I. 103 at 1; D.I. 58-2, Ex. E at 27:6–17, 27:21–28:24; D.I. 112-

1 at 15:13–16:7. Ten days after Uniloc Luxembourg acquired the #134 patent, it

granted Uniloc USA an exclusive license to make, use, sell, and sublicense the

patent.  D.I. 58-2, Ex. L ¶ 1.  Six months later, in November 2017, the Unilocs

filed this suit.

Motorola argues that the Unilocs' failure to meet the monetization

requirement of the Purchase Agreement in March 2017 constituted an Event of

Default that gave Fortress an unfettered right to sublicense the #134 patent and

thereby deprived the Unilocs of the right to exclude Motorola from practicing the

patent.  Motorola contends that because the Unilocs did not possess the

exclusionary rights of the #134 patent when they filed suit, they lack standing and

therefore the Court lacks subject matter jurisdiction over the case.

## II.     LEGAL STANDARDS

Article III of the Constitution limits the jurisdiction of federal courts to

"Cases" and "Controversies."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).

Standing is "an essential and unchanging part" of this case-or-controversy

requirement.  *Id.* at 560.  "Only a party with standing can invoke the jurisdiction of

the federal courts."  *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d

Cir. 2014).  When the court's subject matter jurisdiction is challenged pursuant to

Rule 12(b)(1), the plaintiff bears the burden of demonstrating standing.  *Ortho*

*Pharm. Corp. v. Genetics Inst.*, 52 F.3d 1026, 1032–33 (Fed. Cir. 1995).  To meet

that burden, the plaintiff must allege a "personal injury fairly traceable to the

defendant's allegedly unlawful conduct and likely to be redressed by the requested

relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The personal injury must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).

Patents and the rights they confer are creatures of statute. *See Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40 (1923) ("Patent property is the creature of statute law and its incidents are equally so and depend upon the construction to be given to the statutes creating it and them, in view of the policy of Congress in their enactment."). Section 2 of the Patent Act empowers the United States Patent & Trademark Office (PTO) to grant and issue patents, 35 U.S.C. § 2; and § 154 of the Act provides that every patent issued by the PTO "grant[s] to the patentee, his heirs or assigns . . . the right to exclude others from making, using, offering for sale, or selling [an] invention," 35 U.S.C. § 154(a). *See also* 35 U.S.C. § 271 ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent."); 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). Thus, in a patent infringement case, the actual or threatened injury required by Article III exists solely by virtue of the Patent Act. *See Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) ("Standing in a patent infringement case is derived from the Patent Act."); *see also WiAV Solutions*

5

*LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) ("Because the Patent Act creates the legally protected interests in dispute [in an infringement case], the right to assert infringement of those interests comes from the Act itself."); *see generally Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute.").[1]

The language of § 154 appears to be straightforward. The right that comes with a patent is the right to exclude others from making, using, offering for sale,

---

[1] The right to exclude that accompanies the issuance of a patent pursuant to § 154 is legally distinct from the cause of action created by § 281 of the Patent Act, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." *See generally Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (explaining that a party's standing to sue is a separate question from whether the party has a cause of action). In *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014), the Supreme Court held that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." In *Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019), the Federal Circuit held that "*Lexmark* is irreconcilable with our earlier authority treating § 281 as a jurisdictional requirement." Whether a party constitutes a patentee for purposes of § 281 is, at least in theory, a different question than whether a party is a patentee for purposes of § 154 or otherwise has a legally protected interest, the invasion of which constitutes the injury required for Article III standing. There is no natural or common law right to exclude others from practicing a party's invention. *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40 (1923). A party alleging infringement has constitutional standing only because of statutory rights. *Id.*

and selling an invention. The right is granted to the patentee, his heirs, and his assigns.

But constitutional standing in a patent case is anything but straightforward. Courts long ago abandoned the text of the Patent Act (and its predecessor statute) and expanded the list of potential grantees of a patent's exclusionary rights beyond the patentee and the patentee's heirs and assigns. Most notably, in *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926), the Supreme Court confirmed "the rule" that "an exclusive licensee has a sufficient interest in [a] patent to have standing to sue under Article III of the Constitution." *Propat Int'l Corp. v. RPost US, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007). Ever since *Independent Wireless* courts have struggled to define what an exclusive licensee is. That struggle has been exacerbated by inconsistent rulings about the meaning and scope of the right to exclude that comes with a patent. The resulting body of case law for constitutional standing in patent cases lacks coherence and breeds confusion. *See, e.g.*, *Uniloc USA, Inc. v. Apple, Inc.*, No C 18-00358 WHA, 2020 WL 7122617, at *3 (N.D. Cal. Dec. 4, 2020) (noting that "confusion about the interplay between . . . [a plaintiff's] statutory right to sue [in a patent case] and our doctrine of standing has long persisted"); *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, No. CV01-10396 MMM (CWx), 2009 WL 10699035, at *9 (C.D. Cal. July 14, 2009) (noting "confusion [that] arises from the fact that, in the context of

7

standing to sue for patent infringement, the term 'exclusive licensee' can refer to various types of contractual arrangements with different legal effects"); Roger D. Blair & Thomas F. Cotter, *The Elusive Logic of Standing Doctrine in Intellectual Property Law*, 74 Tul. L. Rev. 1323, 1328 (2000) ("[T]he standing rules in [patent] law appear to be as much a patchwork as Dr. Frankenstein's monster, and only marginally more coherent.").

Resolution of the pending motion turns on the interpretation of three Federal Circuit cases that address the constitutional standing of a plaintiff in a patent infringement action: *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995) (en banc); *WiAV*; and *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225 (Fed. Cir. 2019).

## A.   *Rite-Hite* and *WiAV*

In *Rite-Hite*, the Federal Circuit held that "[t]o be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that *others* shall be excluded from practicing the invention within that territory as well." 56 F.3d at 1552 (emphasis added). That test left open the question of whether an exclusive licensee must receive from the patentee a promise to exclude *all* others from practicing the invention in the specified territory for the exclusive licensee to have constitutional standing.

8

In two cases decided after *Rite-Hite* the Federal Circuit appeared to answer

yes to that question. In *Mars, Inc. v. Coin Acceptor, Inc.*, 527 F.3d 1359 (Fed. Cir.

2008), the court held that "if the patentee *allows* others to practice the patent in the

licensee's territory, the licensee is *not* an exclusive licensee." *Id.* at 1368

(emphasis in original). And in *Textile Productions Inc. v. Mead Corp.*, 134 F.3d

1481 (Fed. Cir. 1998), the court held that "[t]o qualify as an exclusive license, an

agreement must clearly manifest the patentee's promise to refrain from granting *to*

*anyone else* a license in the area of exclusivity." *Id.* at 1484 (emphasis added); *see*

*also id.* ("[I]f a patentee-licensor is free to grant licenses to others, licensees under

that patent are not exclusive licensees."). The court emphasized in *Textile*

*Productions* that the contract at issue—an exclusive requirements contract—did

not "confer a right to exclude *all others* from making an invention" and that the

patent holder "did not promise that *all others*" shall be excluded from practicing

the invention. *Id.* at 1484–85 (emphasis added).

The meaning of "exclusive licensee" endorsed by *Mars* and *Textile*

*Productions* is consistent with the general understanding of the term today, *see*

*Exclusive License, Black's Law Dictionary* (11th ed. 2019) (defining an "exclusive

license" as "[a] license that gives the licensee the sole right to perform the licensed

act, often in a defined territory, and that prohibits the licensor from performing the

licensed act and from granting the right to anyone else; esp., such a license of a

copyright, patent, or trademark right"); and with the general understanding of the term at the time the Supreme Court decided *Independent Wireless, see Exclusive, Black's Law Dictionary* (2d ed. 1910) (defining "exclusive right" as a right "which only the grantee thereof can exercise, and from which all others are prohibited or shut out").

But in *WiAV* the Federal Circuit held that *Textile Productions*'s and *Mars*'s holdings apply only where "a party [is] an *implied* exclusive licensee of the patents in suit in the absence of a written agreement explicitly granting the party exclusionary rights in the patents." *WiAV*, 631 F.3d at 1266 (emphasis in original). Under *WiAV*, when a contract expressly grants an exclusionary license,

> the key question in determining whether [a plaintiff] has standing to assert the [patents] against the Defendants is not . . . whether [the plaintiff] has established that it has the right to exclude *all* others from practicing the patent. The question is whether [the plaintiff] has shown that it has the right under the patents to exclude *the Defendants* from engaging in the alleged infringing activity and therefore is injured by the Defendants' conduct.

*Id.* at 1267 (emphasis in original).

Applying this test, the court in *WiAV* held that in cases involving an express grant of an exclusive patent license, the "exclusive licensee lacks standing to sue a party who has the ability to obtain such a license from another party with the right to grant it." *Id.* at 1266; *see also id.* at 1266–67 ("[I]f an exclusive licensee has the

10

right to exclude others from practicing a patent, and a party accused of infringement does not possess, and is incapable of obtaining, a license of those rights from any other party, the exclusive licensee's exclusionary right is violated."). Thus, under *WiAV*, a third party's legal right to grant the defendant a license to the asserted patent deprives an exclusive licensee plaintiff of standing. *ChromaDex, Inc. v. Elysium Health, Inc.*, CA No. 18-1434-CFC-JLH, 2020 WL 7360212, at *5 (D. Del. Dec. 17, 2020).

*WiAV* did not address whether a third party's legal right to license the asserted patent to the defendant deprives the patent's owner (i.e., the patentee, its heirs, and assigns) of standing to sue for infringement. The parties take opposing sides on the issue.

Support for both sides' positions can be found in Federal Circuit case law. On at least two occasions, the Federal Circuit has held that a patent owner retained standing to sue for infringement even though it had granted a third party the right to grant sublicenses to others. *See Alfred E. Mann Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1362 (Fed. Cir. 2010); *Aspex Eyewear, Inc. v. Miracle Options, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006). On the other hand, in *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *cert. granted, judgment vacated on other grounds*, 575 U.S. 959 (2015), the Federal Circuit held that a patent owner deprived itself of standing after it transferred to a

11

licensee "significant rights," including the right to sublicense the asserted patent, that left the owner without "exclusionary rights and interests created by the patent statutes." In reaching this conclusion, the court held that "th[e] same logic" behind the Federal Circuit's long-held rule that "a nonexclusive license confers no standing on the licensee because the licensee does not have a legally protected interest conferred by the Patent Act" "applies even if it is the patent owner holding the nonexclusive right and [it is] the licensee [who] holds the exclusionary rights." *Id.* at 1345 (emphasis omitted).

In my view, Motorola has the better of the arguments. First, "constitutional standing . . . does not depend on labels; it is the substance of the allegations that matters." *Lone Star*, 925 F.3d at 1234. Thus, a plaintiff's standing does not turn on whether it is designated a patentee, patent owner, patent holder, or exclusive licensee. And the substance that matters is whether the plaintiff has exclusionary rights. The Federal Circuit has stated repeatedly and unambiguously that it is the violation of the exclusionary rights that come with a patent that constitutes the injury-in-fact necessary for Article III standing in a patent infringement case. *See Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1347 (Fed. Cir. 2016) ("Under our precedent, only parties with exclusionary rights to a patent may bring suit for patent infringement."); *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007) ("Constitutional injury in fact occurs when a party performs

12

at least one prohibited action with respect to the patented invention that violates these exclusionary rights."); *id.* ("The party holding the exclusionary rights to the patent suffers legal injury in fact under the statute."); *Intell. Prop. Dev.*, 248 F.3d at 1346 ("A party . . . that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention."); *Lone Star*, 925 F.3d at 1235 ("We have recognized that those who possess 'exclusionary rights' in a patent suffer an injury when their rights are infringed."). And although the scope of a patent's exclusionary rights is subject to debate,[2] at its core, the right to

---

[2] The parties did not cite and I have not found a Federal Circuit case that defines what the "exclusionary rights" are. (There are cases holding that certain rights—for example, the right to sue—are *not* exclusionary rights.) The closest the Federal Circuit has come to providing a definition appears to be in *Morrow v. Microsoft Corp.*, 499 F.3d 1332 (Fed. Cir. 2007). On three occasions in that case, the court appeared to define the exclusionary rights as consisting of "an exclusive license, the exclusive right to license, and the right to sublicense." 499 F.3d at 1341; *see also id.* (distinguishing "exclusive right to sue for infringement" from "the exclusionary rights—an exclusive license (right to make, use, or sell the patented invention) along with the exclusive right [to] license and the right to sublicense"); *id.* ("The grant of this exclusive license and the right to sublicense constituted a transfer of the exclusionary rights to the patent"); *id.* at 1345 (Prost, J. dissenting) (noting that "the majority equates exclusionary rights with the right to practice and right to license"). It is not clear to me why, of the three exclusionary rights identified in *Morrow*, only the right to sublicense is not qualified as "exclusive." Nor is it clear to me how a non-exclusive right to sublicense could ever be "exclusionary" since the exercise of that right would by definition expand the number of people able to practice the patent. As discussed below, I do not believe that under Federal Circuit case law (including an en banc decision) the mere right

13

exclude is the legal right to prevent others from practicing the asserted patent. *Impression Prods. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1534 (2017) ("The right to use, sell, or import an item exists independently of the Patent Act. What a patent adds—and grants exclusively to the patentee—is a limited right to prevent others from engaging in those practices."); *Morrow*, 499 F.3d at 1340 ("Parties that hold the exclusionary rights [under a patent] are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention."); *Ortho Pharm.*, 52 F.3d at 1032 ("[I]t is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for . . . standing."). A plaintiff does not have the ability to prevent the defendant from practicing a patent if another party has the right to allow the defendant to use the patent.

Second, nothing in *WiAV* suggests that its holding should be limited to exclusive licensees. The court held in *WiAV* that "the touchstone of constitutional standing in a patent infringement suit is whether *a party* can establish that it has an exclusionary right in a patent that, if violated by another, would cause *the party holding the exclusionary right* to suffer legal injury." 631 F.3d at 1265 (emphasis

---

to license or sublicense a patent is an exclusionary right sufficient to confer Article III standing. *See* discussion *infra* Section II.B.

added). The fact that the plaintiff was designated in the applicable contract in *WiAV* as an exclusive licensee was relevant only insofar as the contract gave the plaintiff the exclusionary rights that accompanied the asserted patent. In the court's words: "Because the legally protected interests in a patent are the exclusionary rights created by the Patent Act, a party holding one or more of those exclusionary rights—*such as an exclusive licensee*—suffers a legally cognizable injury when an unauthorized party encroaches upon those rights and therefore has standing to sue." 631 F.3d at 1264–65 (emphasis added).

The Unilocs argue that extending *WiAV* to cover patentees—like Uniloc Luxembourg—who grant a licensee the ability to sublicense will lead to "[t]he absurd result" that "*no one* could bring suit." D.I. 67 at 1 (emphasis in the original). But this argument "would convert standing into a requirement that must be observed only when satisfied." *Valley Forge Christian College v. Americans for Separation of Church and State, Inc.*, 454 U.S. 464, 489 (1982). "The assumption that if [the plaintiff] ha[s] no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 227 (1974). Granting a third party the right to license a patent in that party's sole and absolute discretion has consequences. One of those consequences is the loss of the exclusionary rights in the patent. As the Federal Circuit stated in *Morrow*:

15

> [A] patent is a bundle of rights which may be retained in
> whole or in part, divided and assigned. While parties are
> free to assign some or all patent rights as they see fit based
> on their interests and objectives, this does not mean that
> the chosen method of division will satisfy standing
> requirements.

499 F.3d at 1341 n.8 (citations omitted).

In sum, under *WiAV*, the plaintiff in an infringement case—regardless of

whether the plaintiff is the owner of the asserted patent or a licensee—does not

possess the right to exclude the defendant from practicing the patent and therefore

lacks constitutional standing to sue that defendant if another party has the ability to

grant the defendant a license to the patent.

**B.** *Lone Star*

The Unilocs argue that the Federal Circuit's 2019 decision in *Lone Star*

"upended the law of jurisdiction and standing in patent cases" and that under *Lone

Star* "if the plaintiff has the ability to grant licenses or forgive infringement, or if

the plaintiff has the ability to collect royalties, that is sufficient to meet a

constitutional test" for standing. Tr. of Oct. 1, 2020 Hr'g at 17: 1–2; 18:8–11.

There is language in *Lone Star* that could be read to support this argument.

Specifically, the court held in *Lone Star* that:

> As we explained in *Morrow*, "exclusionary rights" involve
> the ability to exclude others from practicing an invention
> or to "forgive activities that would normally be prohibited
> under the patent statutes." 499 F.3d at 1342. *Lone Star*

16

alleged that it possesses the sort of exclusionary rights that confer Article III standing. *See, e.g.*, J.A. 13082–13084 (alleging that it possesses rights in the asserted patents). The transfer agreement, which is referenced in each complaint, also suggests as much. *See, e.g.*, J.A. 2621 (mentioning AMD's "assign[ment]" of rights to Lone Star); J.A. 2025 (allowing Lone Star to "collect royalties"). These rights distinguish Lone Star from the plaintiff in *Morrow*, who lacked the ability to grant licenses or "forgive" infringement. 499 F.3d at 1338–43. Lone Star also alleged that Appellees infringe its exclusionary rights. *See, e.g.*, J.A. 2623–2655. And it is clear that a court could redress an injury caused by that infringement. This is enough to confer standing at the pleadings stage. . . .

Lone Star adequately alleged that it possesses exclusionary rights and that Appellees infringe those rights. *See, e.g.*, J.A. 2621–2655. . . . *Cf. Morrow*, 499 F.3d at 1340 (concluding that a party "hold[ing] exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent" still has constitutional standing to sue for infringement).

925 F.3d at 1234–35. But the Unilocs' understanding that *Lone Star* confers constitutional standing on a plaintiff that merely has the ability to license a patent (or forgive infringement) cannot be reconciled with (1) the Federal Circuit's en banc holding in *Rite-Hite* that "[t]o be an exclusive licensee [i.e., to have exclusionary rights] for standing purposes, a party must have received . . . the patentee's express or implied promise that others shall be excluded from practicing the invention . . . ." 56 F.3d at 1552; (2) the court's holding in *Textile Productions* that a licensee is an exclusive licensee and has constitutional standing only "if the

patentee has promised, expressly or impliedly, that 'others shall be excluded from practicing the invention' . . . ." 134 F.3d at 1484 (quoting *Rite-Hite*); or (3) the court's holding in *WiAV* that a licensee does not have exclusionary rights in a patent if a third-party could license a defendant's infringing activity. Accordingly, I read the quoted passage from *Lone Star* as non-binding dicta.[3]

## III.  ANALYSIS

Motorola argues that the Unilocs lost standing to bring a claim for infringement of the #134 patent when they failed to satisfy their monetization obligations under the Purchase Agreement. I agree. That failure constituted an Event of Default under the Agreement, which gave Fortress the right to use its license of the patent. At that point—on May 16, 2017—Fortress had the legal right to grant Motorola a sublicense to the #134 patent and thus, under *WiAV*, the Unilocs no longer possessed the right to exclude Motorola from practicing the patent.

The Unilocs argue that Fortress "did not view or treat" the Unilocs as having defaulted and did not believe it had a right to sublicense the #134 patent. D.I. 67 at

---

[3] To the extent that the Unilocs are correct in their reading of the *Lone Star* decision it would not change my analysis since I would still be bound to follow *Rite-Hite*, *Textile Productions*, and *WiAV*. *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("[P]rior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc . . . . Where there is direct conflict, the precedential decision is the first.").

4. But it is undisputed that the Unilocs failed to meet the monetization requirement of section 6.2.2 of the Purchase Agreement as of March 31, 2017; and the Purchase Agreement expressly states that the failure "to perform or observe any of the covenants or agreements contained in <u>Article VI</u>" constitutes an Event of Default. D.I. 58-1, Ex. A § 7.1.2. Under New York law, which governs both the Purchase Agreement and the Patent License Agreement, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the meaning of its terms." *MHR Capital Partners LP v. Presstek Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009). Thus, Fortress's after-the-fact subjective beliefs with respect to the Unilocs are of no moment; the clear and unambiguous language of section 6.2.2 dictates the outcome here.[4]

---

[4] The Unilocs cite the Federal Circuit's non-precedential decision in *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 895 (Fed. Cir. 2019) for the proposition that Motorola must show that Fortress "considers Uniloc to be in breach or has asserted a right to sublicense and release Movants from liability relating to the patents at issue." D.I. 86 at 3 (quoting *ADP*). But the contract at issue here is unambiguous and therefore, under New York law, speaks for itself. Moreover, as Judge Alsup recently noted in rejecting the exact argument about *ADP* made by Unilocs:

> *ADP* distinguishes itself from this case. There, the panel described the third-party interest in the patents as "reversionary," or as the Unilocs describe it, "discretionary." Fortress's interest here is neither reversionary nor discretionary. It required no "activat[ion]" or invocation. Rather, under the plain language of agreement, the Unilocs *already granted* Fortress the right to use and sublicense the [asserted] patent on the limitation that Fortress would not *use* the

19

The Unilocs intimate that Fortress's view and treatment of the Unilocs after March 31, 2017 constituted a waiver of Fortress's right to use its license of the #134 patent. And they expressly argue that Fortress's execution of an amendment to the Purchase Agreement in May 2017 "establishes [that the] Uniloc[s] had cured that ostensible 'Event of Default' to Fortress's satisfaction." D.I. 67-2 ¶ 12. But neither of these arguments holds water.

Section 7.3 of the Purchase Agreement, titled "Annulment of Defaults," provides three ways to render an Event of Default inoperative. It reads:

> [o]nce an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement until the earlier of (x) [Fortress] shall have waived such Event of Default in writing, (y) the [Unilocs] shall have cured such Event of Default to [Fortress's] reasonable satisfaction or the [Unilocs] or such Event of Default otherwise ceases to exist, or (z) the Collateral Agent and the Purchasers or [Fortress] (as required by Section 9.4.1) have entered into an amendment to this Agreement which by its express terms cures such Event of Default, at which time such Event of Default shall no longer be deemed to exist or to have continued.

---

right until an Event of Default. This distinction isn't merely semantic.

*Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00358 WHA, 2020 WL 7122617, at *8 (N.D. Cal. Dec. 4, 2020) (citations omitted).

D.I. 58-1, Ex. A § 7.3. As an initial matter, Fortress never waived the Unilocs'
failure to meet their monetization obligations under section 6.2.2 in writing, so no
annulment of that default occurred under clause (x) of section 7.3. Second, there
was no curing here, so no annulment occurred under clause (y). "Cure" means "to
remove one or more legal defects" or "to correct one or more legal errors." *Cure*,
*Black's Law Dictionary* (11th ed. 2019). It requires affirmative action on the party
seeking to overcome the defect or error. For the Unilocs to "have cured" their
failure to meet the monetization requirement of section 6.2.2, they must have done
something to fix or remove that failure. As the Unilocs' counsel admitted during
oral argument, there was nothing that the Unilocs could have done to cure their
revenue deficiency. Tr. 27:16–17 ("If the money doesn't come in by a certain date,
there's no way that that fact can be changed.").

Third, under clause (z) of section 7.3, for an amendment to annul a default,
the amendment must "by its express terms cure[] such Event of Default." The May
2017 amendment, however, makes no reference to either a curing by the Unilocs of
their failure to satisfy their monetization obligations under section 6.2.2 or a
waiver by Fortress. On the contrary, the amendment states that "[t]he execution,
delivery and effectiveness of this Amendment *shall not operate as a waiver* of any
right, power or remedy of the Collateral Agent or any Purchaser under the

21

Agreement or any Document, *nor constitute a waiver* of any provision of the Agreement or any Document."  D.I. 58-1, Ex. C § 4 (emphasis added).

Accordingly, I find that an Event of Default occurred under section 6.2.2 of the Purchase Agreement on March 31, 2017 and that the Event of Default was neither cured by the Unilocs nor waived by Fortress.  It follows that Fortress had the legal right to sublicense the #134 patent when this suit was filed in November 2017 and therefore, under *WiAV*, the Unilocs lacked the requisite exclusionary rights in the patent to have standing to bring suit.

Finally, in response to briefing I ordered after oral argument, the Unilocs argued for the first time that any license Fortress obtained as of May 16, 2017 was prospective only and therefore that license could not have deprived the Unilocs of standing to sue for infringement that occurred prior to that date.  Neither the Purchase Agreement nor the Patent License Agreement, however, limit the scope of Fortress's license to future infringement.  And under New York law, "if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014). That conclusion is reinforced in this case by the fact that the Patent License Agreement expressly provides that it can remain effective until the date on which all statutes of limitations for infringement of the licensed patents have run.  D.I.

58-1, Ex. B § 5.2. Because the statute of limitations for infringement extends up to six years after the expiration of a patent, *see* 35 U.S.C. § 286; *In re Morgan*, 990 F.2d 1230, 1232 (Fed. Cir. 1993), and because there is no need for a license to practice an expired patent, such a provision makes sense only if Fortress had the ability to grant a retroactive license for past infringement. Thus, the license Fortress obtained on May 16, 2017 gave it both retrospective and prospective rights to sublicense the asserted patent and thereby deprived the Unilocs of standing to sue Motorola for infringement of the asserted patent before and after May 16, 2017.

## IV. CONCLUSION

For the reasons discussed above, neither Uniloc Luxembourg nor Uniloc USA held exclusionary rights to the asserted patent on the date they filed this suit. Accordingly, they lacked standing and this court lacks subject matter jurisdiction under Article III. The Unilocs' standing deficiency cannot be cured, even by adding another party. *Azure Networks*, 771 F.3d at 1347. I will therefore grant Motorola's motion and dismiss the case.